Good morning, Your Honors, and may it please the Court, my name is George Prince. I represent the Director of the Department of Social Services and the Deputy Director in their official capacities. Good morning. I apologize in advance for using Bob Dylan's voice this morning because mine has been taken over by a cold. Your Honors, this case goes back almost five years in its various iterations. I think we've been to this Court three times already. This will be the fourth appearance in this case and a companion case. There are actually three cases that are interwoven in a sort of Byzantine pattern. I will do my best to keep them straight, but I must admit that even I get a bit confused on them sometimes. I think there have been eight different written submissions before the Court, and I hope this may be the final one today. I can't promise that. As we have indicated in our papers, we strongly believe that the order from Judge Patel in her in the order granting the preliminary injunction exceeds the jurisdiction of the Court, and that same order was incorporated by reference into the judgment that she issued on remand from this Court in the Allenby case. And for purposes of clarification here, I'll refer to the case that is numbered 10, 15593 is the Allenby case and the case that is numbered 0917649 as the Wagner case. But essentially the facts are congruent and the issues are congruent in both cases. So the case that has the 2010 numbering is after remand? That's correct, Your Honor. After remand from the Ninth Circuit, which issued its decision in December of 2009, the case went back to Judge Patel, back to the district court for entry of judgment, not inconsistent with the Ninth Circuit's opinion. And with that decision, Judge Patel incorporated parts of the other case that were pending at that time. Part of the other convolution in this case is that there was another matter in another case entitled Wagner that involved the private right of action. The Ninth Circuit had taken that case, put it on the back burner. Right, right, right, right. We know. Right. Thank you. You have a better sense of that than I do then. Again, it's our view that the Court has exceeded its jurisdiction in that it has now directed the payment of State monies for foster children who are not eligible for funding under the Child Welfare Act. Child Welfare Act population in California foster care group homes is about 59 percent of the children. The remaining 41 percent are not eligible for the matching Federal funds that flow from the Federal Government. However, the order that Judge Patel issued, as well as the directive in her preliminary injunctive order, requires that the State of California pay the same rate for those children who are not eligible for Federal funds. The problem is that those children aren't treated differently. They're not identified differently. It's just hard to know, you know, which children are eligible and which aren't. And the State doesn't have a different funding rate for children who are not eligible. So that makes it extremely difficult in terms of trying to ‑‑ it made it difficult for the judge in terms of trying to determine how to implement the decision from the Ninth Circuit. Granted, Your Honor, there is a bit of difficulty there. I should point out that up until September of 2009, when the State Budget Act of 2009 went into effect and essentially dictated that on October 1st, the funding for group homes would be cut back by 10 percent, in recognition of California's historic budget crisis. There had been no separate treatment of the children who were Federally eligible compared to the children who were not Federally eligible. California has a much more generous system than the simple Federal system, and added ‑‑ So they all got this ‑‑ they were treated the same? Yes. It's my understanding that the group home operators and providers may know or should be able to determine which of the children in their care fall under the Federal category and which do not. But up until that point, it didn't matter, because California's system was uniform across the board. However, in October 1st, 2009, the directive became effective. But it was across the board. And the classification level that you used to determine compensation didn't change. So it's ‑‑ I mean, California could have a different system where it segregated out the non‑eligible children from those who are Federally eligible, but it has not done that to date. So the classification level hasn't changed in terms of determining what the compensation, the base compensation level is. That's correct, because the rate levels are set on the basis of the needs of the child, not their categorization as eligible or ineligible under the Federal law. And in response to Judge Patel's directive in the 09 case, the preliminary injunction case, she asked the State of California to ‑‑ or the Department of Social Services, the defendants in the case, to submit a plan to the court to indicate ‑‑ Could you speak either louder or more into the microphone? Yes, Your Honor. My apologies. Is that better? Thank you. Yes. Thank you. Judge Patel asked the State to submit a plan to her so she could consider how to craft her order. And what the State did on the short amount of time given it, because as I recall the injunctive order or her request went out just before Thanksgiving and we were due back in court within two weeks or so. So what the State submitted was two separate rate schedules, one respecting the full Federal rate, the other one taking that rate and reducing it by 10% in step with the California Budget Act of 2009 that said you've got to cut 10%. Judge Patel took that and rather than issue some more detailed order with any analysis, simply said that as a practical matter, if you combine those two amounts of money, it will result in a dilution of the funding to the Federal kids or the Federally eligible kids. And right about at that same time, the Ninth Circuit's decision came out on December 12th saying cover the costs within the Child Welfare Act, me, meant you had to actually cover those costs and integrate into the State's system. The CNI, California Necessities Index, which was essentially the cost of living index to raise the amount up to keep it in step with inflation, based on the original matrix of costs that California set out in its statute and created back in 1990 or 91 with Your view, how could the two schedules be practically applied in an individual institution? That, Your Honor, would in essence depend upon the institution's efforts to distribute those funds. And I say that because once the State made the payments in step with the Child Welfare Act, it essentially discharged its duty. And it was within the purview and essentially the authority of the agent, of the homes, to determine how to make those adjustments. But the State, but the homes have the obligation to feed, to clothe, to transport, to do all of these things under the statute. So how could the State fulfill its obligation? I mean, how could the institutions fulfill their obligations and still make the cuts? So they're supposed to give fewer services to the non-eligible kids than to the eligible kids? Is that what the State was contemplating? I don't, I can't say the State was contemplating that. I think the State understood that the homes could make those decisions. The homes make those decisions all the time. They get funding from sources other than the Department of Social Services, other than counties. They may well have decided that funds we raise from charitable contributions can go to supplement and make sure that all the kids get the same amount of food. The problem with the injunctive order is that it's well settled in this district, or excuse me, in this circuit, that when injunctive relief is sought against a State agency or a State official, that relief must be no broader than necessary to remedy the constitutional violation. That goes back to the old Toussaint case. I make the citation from the Barnes case, which ‑‑ But on the other hand, the district court has broad discretion in shaping injunctive relief. So you're up against that rubric as well. Yes, and we understand the court has a broad discretion, but that doesn't mean it simply take the most simple solution and simply say, well, rather than me, rather than the district court ordering the department to come up with a more detailed system or come up with some other means by which it could direct the homes how to try to grapple with the situation. It simply said, just give everybody the same funding. And when you've got 41% of the population that is not subject to the federal ‑‑ But that's what the State does in setting the classification level. You give everybody the same funding. So the court was doing nothing more or less than what the State does when it determines the compensation level for the homes. Well, and yes, Your Honor, except up to the point of December 2009, the State treated everyone the same. And essentially the State's generosity to that additional population that otherwise, the State gets no money from the federal government, not one penny of federal financial participation. In essence, if the State wanted to simply cut down or shut down that program altogether, that 41% of kids in that population would unfortunately have no recourse. That's the kind of threat we hear these days all the time, and it's very distressing. But the concern that the judge had, I think, was it not, was that she didn't want to see the levels for the federal children, federally eligible children, be reduced or diluted by the reduction in payments to the other children. And so this was a response to that concern. And I'm not quite sure I understand how better to address that concern. Well, I think the Department could, in working with the group home providers, come up with a more nuanced mechanism. Ultimately, the percentage used by the plaintiffs in their case, and I think it's incorporated into the court's papers, is the dilution, as a practical matter, ends up being about 4.1%, which is not insignificant, but it is a huge difference from the disparity of the 10%. Right. But is this not a preliminary injunction? The preliminary injunction in the 09 case, yes, but a major feature of that preliminary injunction was incorporated, by reference, into the judgment in the 2010 case. Again, in the sense of the... Well, I'm just wondering why, if you came up with a better system, you couldn't go to the court and say, because the court can continue to administer the case, to adopt that. Well, that is certainly the possibility. We are at the preliminary injunction state. Your Honors, I see that my time is running short, so I will reserve the remainder of it for rebuttal, unless the Court has any further questions. Thank you. Thank you very much. Good morning, Your Honors. May it please the Court, I'm William F. Abrams of Bingham McCutcheon. For the plaintiffs and respondents, and with me is Craig Taggart, Michael Mortenson, and Jessica Mahan-Scholes of the firm. I'd like to start by clarifying exactly how the system works in terms of placing a child. When a child is put into the foster care system in the State of California by the Department of Social Services of the local county, there is no determination as to whether or not that child, at that point, is a federally eligible or a non-federally eligible child. These are emergency situations, serious situations. The child is pulled and, in the case of group homes, is placed in a group home. There is later what's called a look-back, and that determination is to decide whether or not the child is federally eligible, as defined by whether or not his family would have been eligible for AFDC benefits under 1996 guidelines or not. But they're taken and placed in the group home. And the group home treats all the kids the same, and it's roughly the 59 to 41 percent breakdown that is not in dispute in this case. The operators of the group homes don't distinguish. They take the children as they're placed, and they try to deal with the children as best they can. They don't keep them. Are they in good conscience? I mean, how could they, as a practical matter, distinguish among the kids in terms of federally eligible or not when delivering programs and services? How would that, as a practical matter, work? They could not do that, Your Honor. They would have to say that we have separate books, and this child here who's on the top bunk is a federally eligible child, and that child gets different services then, gets different food, gets different equipment, gets different educational benefits than the child who's not federally eligible. That's not ethically or morally proper. It's not practically proper. It's not called for by the law. Now, we've heard the State today for the first time suggest that there's some delegation of the responsibility for the allocation of funds on the group homes. There's no basis in law. There's no basis in fact for that. The way that the system is structured under the State system is that the children are placed in the group homes, and these are profoundly children in profound need. They are not eligible for placements with foster families. They go into group homes for specific reasons. And then the group home deals with them, and under the Child Welfare Act, they provide services that cover the costs of shelter and education and food and the like, the basic necessities of life. You can't distinguish. The only way you could distinguish is to say that under the State's proposal, the only proposal they made in this case was we have two separate rate systems. Well, then a child is going to get less food, is going to get less services, who's not federally eligible. What Judge Patel did in the underlying case was all she had to deal with was this two-tiered system proposed by the State. She recognized that that would necessarily dilute the services to the Child Welfare Act children. And, in fact, we have an analysis at footnote 12 on page 34 of our brief in the Allenby case, which shows that if you apply the new rates under the subsequent decision that we've got to use the new rates, it's actually a 15% difference, a 15% dilution of the federal benefits. It's the State system that we're dealing with, and there's not a separate system for non-federally eligible children. And so what the Court did was tailor the relief to ensure that there's compliance with the Child Welfare Act. And it doesn't have an 11th Amendment issue. It is fully within the Court's discretion to tailor the appropriate remedy and the appropriate relief. And we submit on that. Are there any questions? Could you explain once again what is the requirement to become federally eligible for a foster child? When the child is placed, typically these are often emergency situations, then the social services agency, typically Child Protection Services or DSS, will look back to determine if the family would have been eligible or was eligible under 1996 Age of Families with Dependent Children regulations. And if so, they are then deemed to be a federally eligible child. If not, they're not federally eligible. But that determination is not part of the placement, Your Honor, and it's not part of the decision as to what kind of treatment or care. The goal is to get the kids into the best possible placement and to pay for it. And the state's elected to participate in this co-funding process with the federal government under the Child Welfare Act, and that's how the state's designed its own system. What is the decision process to place a foster child in a group home? An evaluation is made sometimes on an emergency basis as to the needs of the child. So in the group homes, these are children who have profound emotional, mental health issues. They perhaps have they may be sexual offenders. They may be violent offenders. They may have other disabilities that require them to be in a specific specialized placement. They're not eligible. They wouldn't be able to be in a foster family situation. These are approximately 10,000 children, roughly. Your Honors, I have nothing more, and we're willing to submit unless the Court has any further questions. There don't appear to be any. Thank you. Thank you, Your Honors. Thank you again, Your Honors. Judge Hugg, I would point out to you that the specific provisions for federal eligibility are set forth in 42 United States Code Section 672, and there are a variety of factors. I think there are about 10 or 12 differing factors that can create federal eligibility in a child. They have to do with placement and the means by which the child gets the referral to the Department of Social Services. So the details are set forth there. Just a few points. Mr. Abrams made the point that there is no mechanism by which the group homes can make distinctions between the treatment of children. However, once the state provides the funding to the group homes, the group homes use those funds as they choose. They may choose to buy a fancy Cadillac for the group home executive director, or they may choose to buy a Ford Fiesta. Those are choices that the group home makes. So there is certainly discretion there, and there is some history in the record of some of the perhaps extravagant salaries paid to group home executive directors that might otherwise go for the children. Finally, there may be a situation in California with the size of group homes, it can be as small as four or five kids, where there may be a group home where there is not a single child in that home who is eligible under the federal requirements, and yet under Judge Patel's rationale, those kids would get the full amount of California's. But the state has, can regulate that. If the state decides that there is an abuse in the system by regulation or by statute, the state can rectify that, but not with the broad swap that the state has done in terms of just 10 percent across the board regardless. That's not nuanced enough for the situation. Precisely, which is why we think Judge Patel's order is not nuanced enough. It simply says give everybody the same funding. There are more detailed ways in which that can be done. He was responding to what the state did. That's the problem. That was the position that she was placed in. Meeting non-nuanced with non-nuanced. Right. In the short-term way in which all this came up with the budget crisis and all this coming right on the eve of the holidays, there was. It's a tough situation all the way around. There's no doubt about that. But the children are the most important part of the matrix. Yes. And the state does not disagree with that, Your Honor. We do have certain realities that we must face, though, and that is the hard part here. Thank you very much, Your Honor. I have one other question. Of course. Just as an example, suppose the state had allocated $50,000 to a group home. And with the population of the federal eligible people, it would require $50,000 to cover their costs. This would leave nothing left for the state eligible, wouldn't it? Well, if I understand Your Honor's example, the state children, if any remaining in that home, would still benefit from California's generosity in that it provides funding for kids who are not federally eligible. So if there were a couple kids in that home who were not federally eligible and they were somehow separated into two groups, those kids would still get the same amount of money from the RCL, depending on their level of care, but reduced by the 10 percent mandated by the State Budget Act. By definition, then, the costs of the federal eligible students would not be covered. If there were a mixed situation with the way the scenario is now, I think that's correct, Your Honor. I'm not quite sure I fully grasped your example, though. Okay. Thank you very much. Thank you. Any further questions? All right. Thank you. Thank you, Your Honor. The matters just argued are submitted for decision. That concludes the Court's calendar for this morning. And the Court stands adjourned.
judges: Hug, Schroeder, Rawlinson